UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )     2:25-cr-00076-JAW<br>)<br>KEVIN BELL )| |

MOTION TO DISMISS

Defendant, Kevin Bell, by and through undersigned counsel, moves this Court for Dismissal of the May 8, 2025 indictment charging Mr. Bell with one count of making a threat against the President in violation of 18 U.S.C. §871(a). The Indictment must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b) because it fails to state an offense and because the alleged threat is not a "true threat" and is protected Speech under the First Amendment.

I. INTRODUCTION

The government has alleged that "On or about April 5, 2025, in the District of Maine, the defendant, Kevin Bell a/k/a Ronen Stoloff, knowingly and willfully made threat to take the life of and to inflict bodily harm upon the President of the United States." (ECF No. 37). That is the extent of the information included in the Indictment.

Based on an affidavit supporting the original Complaint and subsequent discovery provided by the Government, the defense believes that the alleged statement occurred at a local diner. The Complaint alleged that Mr. Bell "stated that he does not care for 'Trump' and made a threat that 'I'll try to shoot him' or 'I'll just shoot him.'" (ECF No. 3).

1

According to the Complaint Affidavit, the alleged threat was made during a broader conversation with a Department of Public Safety Senior Investigator for the State of Maine ("the Officer"). *Id.* A portion of the conversation following the alleged threat was recorded, but that recording does not contain any threats, profanity or outbursts of anger.

The Officer reported his interactions with Mr. Bell on April 5, 2025, but did not describe the specific threatening language in his report. (ECF No. 3). On April 6, 2025 in response to an inquiry by investigating agents, the Officer indicated that Mr. Bell said either "I'll try to shoot him" or "I'll just shoot him." *Id.* The Complaint was filed on April 7, 2025, and Mr. Bell was arrested that same date. (ECF Nos. 3, 17). A Grand Jury returned the Indictment on May 8, 2025 (ECF No. 37).

## II. THE INDICTMENT FAILS TO ARTICULATE AN OFFENSE UNDER 18 U.S.C. §871.

The charging statute, 18 U.S.C. §871, provides:

> Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

As a general rule an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c). The Supreme Court has instructed that an indictment is sufficient if it contains the elements of

2

the offense charged, fairly informs the defendant of the charges against which he must defend and enables him to enter a plea without fear of double jeopardy. *Hamling v. United States,* 418 U.S. 87, 117 (1974); *accord, United States v. Serino,* 835 F.2d 924, 929 (1st Cir.1987). The indictment may incorporate the words of the statute to set forth the offense, but the statutory language "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) *quoting Hamling,* 418 U.S. at 117–18 (internal citations omitted). "'Where guilt depends so crucially upon such *a specific identification of fact,* our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.'" *Hamling,* 418 U.S. at 118 (quoting *Russell v. United States,* 369 U.S. 749, 764, (1962)) (emphasis in *Hamling*).

  Count 1 contained in the Indictment fails to allege the threat made. It neglects to identify how the alleged threat was made and/or communicated. The Indictment gives no indication as to the immediacy of any intention to harm the President. The Indictment lacks specificity as to when the alleged harm was to occur. The Indictment makes no allegation of a true threat, and it makes no reference to Mr. Bell's subjective intent. The Indictment fails to identify the person to whom the threat was made. The Indictment fails to identify which President the threat was referencing. Other than the date of the alleged threat, the Indictment offers no specific identification of facts. The present Indictment does nothing to inform Mr. Bell of the specific offense or utterance with which he is charged.

### III. The Statement Charged in the Indictment Does Not Constitute a True Threat and Remains Protected Speech Under the First Amendment.

The First Amendment states "Congress shall make no law… abridging the freedom of speech[.]" U.S. Const. amend I. "The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660–61 (2000) (internal quotation marks omitted)). They were guided by the belief that the freedom to think and speak is both an "inalienable human right" and a means "indispensable to the discovery and spread of political truth." *Id*. (citations omitted).

Statutes such as 18 U.S.C. § 871, which makes criminal a form of speech, must be interpreted with the commands of the First Amendment clearly in mind. At the core of freedom of speech is the protection of political speech. See *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966) ("There is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."). Given the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," the First Amendment protects even the "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

A person's speech is constitutionally protected by the First Amendment unless it falls into one of the "few limited areas" or "historically unprotected categories of speech." *Counterman v. Colorado*, 600 U.S. 66, 73 (2023). As relevant here, the Government must prove that the speech is a "true threat [] of violence" to criminally punish it. *Id*. "True threats" encompass those statements where the speaker means to communicate a "serious expression" of an intent to "commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003). The "true" in "true threats" distinguishes statements that engender "fear of violence" from "jests, 'hyperbole,' or other statements that when taken in context, do not convey a real possibility that violence will follow." *Counterman,* 600 U.S. at 74.

### a. The Alleged Statement Was Objectively Not a True Threat

Whether a statement constitutes a true threat requires an objective inquiry at the outset. *Counterman,* 600 U.S. at 72. Courts must consider the statement's content and context and answer whether "a reasonable recipient familiar with the context of the communication would find [it] threatening." *U.S. v. Nishnianidze* 342 F.3d 6, 15, 16 (1st Cir. 2003) citing *United States v. Fulmer,* 108 F.3d 1486, 1491 (1st Cir 1997) and *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir 1997), all abrogated on other grounds by *Elonis v. United States*, 575 U.S. 723 (2015)); see also *Elonis*, 575 U.S. at 751. Relevant factors in determining whether a statement constitutes a true treat include the speaker's demeanor, (*Fulmer*, 108 F.3d at 1492), the frequency of the contact or statement (*Id.),* whether the threat was conditional (*Watts v. United States*, 394 U.S. 705, 708 (1969)), whether it was communicated directly to the identified victim at their home or place of work (*United

5

*States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir. 1993)), and the reaction of the recipient (*Watts,* 394 US at 708).

Context can soften even the most direct statements that otherwise seem to threaten future violence. The touchtone case for true threats against the President is *Watts v. United States.* 394 U.S. 705 (1969). In *Watts*, the Supreme Court reversed a conviction under a statute that prohibited threats against the President. After receiving his draft classification and being ordered to report for a physical the following week, the defendant stated, "I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id*. at 706. Despite the plain meaning of the statement expressing a willingness to shoot the President, the Supreme Court held such "political hyperbole" failed to qualify as a true threat. *Id*. at 708. The statement was delivered during a contentious debate, and the statement was expressly conditional, so a reasonable listener would not have understood it to be a serious expression of an intent to shoot L.B.J. *Id*.; see also *United States v. Olson*, 629 F. Supp. 889, 893–95 (W.D. Mich. 1986) (holding statement by defendant that "I am threatening the life of the President today. I will take down any fed that comes to get me and when you come down here, come with plenty of firepower" was not a true threat because it "contained no specification of time, place or date" and was made in response to provocation, at a bar 970 miles away from Washington by someone who had no weapons.)

Similarly, in *United States v. Daulong*, 60 F. Supp. 235 (W.D. La. 1945), a district court quashed a two-count indictment that charged the defendant with making threats against the President. The *Daulong* defendant allegedly stated that, if someone did not kill

6

the pPresident, he "had a notion to do it himself" and "[h]e hoped somebody gets him (the President) tonight, and if somebody did not, he, the defendant, felt like going up there and doing it himself." *Id*. at 236. The court reasoned that simply expressing a "notion," that is, that the speaker "feels like" killing the President if someone else does not, "can not be construed as an intention, determination or purpose to perform the deed." *Id*. Rather, "there must be the positive expression of intent and purpose, presently or in the future, to do the thing denounced." *Id*. (emphasis added).

The Fourth Circuit concluded statements were not threats because they were impotent and not communicated directly to the supposed target. *United States v. White*, 670 F.3d 498, 513–14 (4th Cir. 2012) abrogated on other grounds by *Elonis v. United States*, 575 U.S. 723 (2015). In response to a post on a neo-Nazi website about the firebombing of a civil rights activist's house, the defendant had posted, "Good. Now someone do it to Warman[,]" a different activist. *Id*. at 513. Later, he posted Warman "should be drug [sic] out into the street and shot" and "must be killed." *Id*. In its analysis, the Fourth Circuit noted these communications "were posted to neo- Nazi websites and not sent directly to Warman." *Id*. Additionally, nothing suggested the defendant had any ability to execute the supposed threats; he did not have "control over other persons" who might do the deed, and there was no evidence that any "violent commands in the past had predictably been carried out." *Id*. The Court concluded the lack of direct communication, while not necessarily an essential component of a true threat, nonetheless made it "impossible for us to conclude that a reasonable recipient would understand White's communications to be serious expressions of intent to commit harm." *Id*. at 513–14. That

7

did not change even accounting for his "earlier references to actual violence, such as firebombing of an activist's house, and the violent edge that accompanied all of [his] statements." *Id*. at 514; see also *United States v. Fenton*, 30 F. Supp. 2d 520, 524 (W.D. Penn. 1998) (concluding statements "spoken during a conversation with an unrelated third party and not directly to the victim" may have "reeked of animus" but were not true threats).

Here, Mr. Bell's alleged statements do not, as a matter of law, objectively convey a serious intent to commit violence. At the outset, the statement he allegedly made does not appear in the Indictment, and the precise threat he allegedly made is unclear. The setting of the alleged threat was in a public space, at the bar of a diner, over a meal. The tone of the conversation was not vitriolic; it was conversational. It does not appear that the alleged statement is one that Mr. Bell repeated. Mr. Bell did not directly communicate any threat to the apparent object of the threat. He did not direct the threat to the home or workplace of President Trump. He did not repeatedly contact President Trump. Moreover, there was no specification of when any future action might take place. The alleged threat, on its face was not made so unequivocal, unconditional, immediate or specific as to President Trump as to convey a gravity of purpose and imminent prospect of harm. No reasonable listener would have taken any alleged statement by Mr. Bell at the diner to be a serious expression of an intention to harm the President.

Because the alleged statement does not express an objective serious intention to do harm, it is not a true threat within the meaning of 18 U.S.C. §871, and, therefore, the

protection of the First Amendment applies. The prosecution of Mr. Bell violates his right to free speech.

### b. The Indictment Fails for Failing to Address Mr. Bell's Subjective Intention.

The language of the political arena is often vituperative, abusive, and inexact. *Watts v. United States*, 394 U.S. 705, 708 (1969). But, the First Amendment prohibits the criminalization of pure speech unless the government proves that the speaker specifically intended to threaten. Post *Counterman,* the Government must prove that the speaker acted recklessly, i.e., that the "speaker is aware 'that others could regard his statements as threatening violence and 'delivers them anyway.'" *Counterman*, 600 U.S. 66 at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).

For example, in *Counterman,* the United States Supreme Court reversed a conviction where the defendant sent messages to a stranger, including statements such as, "Fuck off permanently" and "You're not being good for human relations. Die." *Id*. at 70. The stranger was "afraid [she] would get hurt" and believed that the defendant was "threat[ening her] life." *Id*. (alteration in original). According to *Counterman,* the critical inquiry is whether the defendant subjectively understood "the threatening nature of his statements," *Id*. at 69. Without such a showing, the criminal prosecution violated the defendant's First Amendment rights. *Id*. at 82.

As an initial matter, the present Indictment is wholly silent as to Mr. Bell's subjective intent. Beyond that, Mr. Bell did nothing more than exercise his constitutional

right to political speech when he engaged in a casual conversation at his hometown diner. Mr. Bell was not aware at the time that others may regard his alleged statements as threatening violence. Mr. Bell is an autistic person. As such, he has trouble understanding and responding to social cues. He allegedly expressed his initial support for and then, his disappointment in President Trump. He made these alleged statements while dissatisfied with the government and the state of the world. Any statement he allegedly made during the conversation was nothing more than an off-color attempt at humor - political hyperbole - and not a serious expression of any intent to commit unlawful violence.

There was never any real possibility of violence because Mr. Bell was over 500 miles from Washington, D.C., did not know anyone in Washington, D.C. and had not made any arrangements to visit that location. Furthermore, it appears that President Trump was actually in Florida on April 5, 2025,[1] putting more than 1,500 miles between Mr. Bell and him. Additionally, Mr. Bell does not own any firearms. None were registered to him, and none were located at his home. Mr. Bell was not aware that his alleged statements would be seriously regarded as threatening violence, so he did not make them in the face of any such awareness. Therefore, he did not act recklessly, and this Court should dismiss the case against Mr. Bell as it violates his First Amendment rights.

## IV.   CONCLUSION

The Indictment in this case does not adequately allege a violation of 18 U.S.C. 871 and therefore, must be dismissed.  There is no true threat here. Mr. Bell's alleged

---

[1] Kristina Web, *Trump in Jupiter: President Could go to Northern Palm Beach County Course this Weekend,* Palm Beach Daily News (April 1, 2025) https://www.palmbeachdailynews.com/story/news/trump/2025/04/01/faa-notice-trump-to-go-to-jupiter-golf-course-this-weekend/82754003007/

statements fall within the protection of the First Amendment's free speech clause. Because this prosecution is in violation of Mr. Bell's fundamental First Amendment rights, Mr. Bell respectfully requests the Court dismiss the case.

Dated:  June 30, 2025                                  Respectfully submitted,

/s/Caleigh S. Milton, Esq.
Attorney for Defendant
Assistant Federal Public Defender
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
Caleigh_milton@fd.org

## CERTIFICATE OF SERVICE

      I, Caleigh S. Milton, hereby certify that I have this date caused the within Notice of Appearance to be served upon Assistant United States Attorney Nicholas Heimbach, Esq. by forwarding a copy via the Court's ECF System.

Dated: June 30, 2025                  /s/ Caleigh S. Milton
                                           Attorney for Defendant