## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

KEVIN BELL,
    A/K/A RONEN STOLOFF

No. 2:25-cr-00076-JAW

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States of America opposes Kevin Bell's Motion to Dismiss (Dkt. 46). Bell moves to dismiss the indictment, raising two arguments. Dkt. 46. First, Bell argues that the indictment is deficient and fails to state an offense. *Id.* at 1, 2. Second, Bell argues that the alleged threat is not a "true threat" and instead speech protected by the First Amendment. *Id.* at 1, 4. For the reasons set forth below, both arguments are without merit and the Motion should be summarily denied in all respects.

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND

On April 5, 2025, an investigator (hereinafter, "Witness 1") from the Office of the State Fire Marshal, Maine Department of Public Safety, was off duty and in standby status while eating lunch at a diner in Bridgton, Maine. Government's Exhibit 1 (hereinafter, "G.Ex. 1") at 3. Witness 1 observed a man—later identified, and referred to hereinafter as, Bell—outside the diner looking through the windows of Witness 1's unmarked cruiser. *Id.* Once inside the diner, Bell asked a staff member who Witness 1's vehicle belonged to. *Id.* After learning the vehicle belonged to Witness 1, Bell sought out Witness 1, moving to sit closer to him before initiating a conversation. *Id.*

Bell then made statements to Witness 1 about his prior encounters with law

enforcement, including making comments on social media that had resulted in encounters with the United States Secret Service and the Federal Bureau of Investigation. *Id.* Bell also disclosed that he had recently been detained by the Bridgton Police Department and taken to the hospital for an involuntary evaluation. *Id.* He expressed consternation with law enforcement's ability to find him and asked about cellphone tracking and the Fourth Amendment. *Id.* He told Witness 1 about his efforts to avoid detection through "burner phones," leaving his "burner phone" at home so he is harder to locate, and setting up a "VPN," or virtual private network, to share comments online without being caught. *Id.*

In the course of his self-initiated conversation with Witness 1, Bell disclosed that he does not like "Trump's FBI" but that he was not sure if "Biden's FBI" was any better. *Id.* He hated President Bush the most, Bell disclosed, but he had not acted on his thoughts to kill President Bush. *Id.* Bell felt President Trump was not much better. *Id.* Bell stated, "'I wanted to shoot Bush, but didn't, but now Trump is in and I don't care for him either' continuing to say either 'I'll try to shoot him' or 'I'll just shoot him.'" *Id.* Bell then acknowledged that he needs "to stop making comments about killing the President" and to stop talking about it because he was going to get himself in trouble. *Id.*

Bell, a pilot, spoke about hijacking commercial aircraft, telling Witness 1 that he "is able to take over a plane and crash it, hurting a lot more people." *Id.* Bell expressed his surprise that he was still permitted to fly since he could easily fly out of Fryeburg and do whatever he wanted, "like fly to D[.]C." *Id.*

Witness 1, who had been attempting to obtain additional information about Bell from other law enforcement entities, was ultimately able to begin audio recording the

conversation. *Id.; see also generally* G.Ex. 2.[1] Bell told Witness 1 about making statements at schoolboard meetings. G.Ex. 1 at 4. Witness 1's audio recording began as Bell stated, " . . . when I going off to people in school board meetings and things like that." G.Ex. 2 at 0:07. Witness 1 replied that he would not make any comments because they keep getting Bell in trouble. *Id.* Bell replied, "I think that's true in general everywhere, whether it's in a diner or in person or offline or anywhere, um, I think that's part of my, that's the problem that I'm starting to see it [unintelligible]." *Id.* at 0:21. When Witness 1 asked if he ever acted on his statements, Bell responded, "No, never." *Id.* at 0:43. Bell also stated, "Just saying them itself is a problem too." *Id.* Witness 1 replied, "It certainly can be." *Id.*

Bell stated he was a loose cannon in his twenties and did not like President Bush, which was when it all started. *Id.* at 0:53. The Secret Service came to talk to him in Nevada in 2003. *Id.* at 1:05. Bell stated, "I think, you know, I don't like the president, it's like well that's not within my control." *Id.* at 1:27. When asked if he did not like all the presidents, Bell indicated he especially did not like President Bush, but a lot of people did not like him. *Id.* Bell then stated, "There's, uh, people who don't like Trump and they try to, you know, uh, almost taken out with the rally you know.[2] You know those people

---

[1]      Government's Exhibit 2 contains the audio recording of a portion of Bell's conversation with Witness 1. The audio file has been redacted to prevent disclosure of the town in which Witness 1 resides. Redactions are indicated by beeping sounds within the audio file. The audio file has a duration of fourteen minutes and four seconds, with several lulls in the conversation. Should the Court prefer the government provide a transcript of the recording, the government will prepare such a transcript.

[2]      An attempt was made to assassinate then-Former President Trump on July 13, 2024, in Butler, Pennsylvania. *See, e.g.,* FBI Press Release, https://www.fbi.gov/news/press-releases/update-on-the-fbi-investigation-of-the-attempted-assassination-of-former-president-donald-trump (accessed August 11, 2025).

truly ruin their lives. Like once you do that, it's like the baby's out, you know you can't put the baby back in the womb, you know." *Id.* at 1:40. Witness 1 agreed, "No, you can't." Bell continued, "And, um, like this uh, kind of like can empathize like more recently the guy who shot the United Healthcare CEO. I'm like, yeah, those healthcare agency, um, companies are so greedy. But okay, well, nothing I can really do about it, you know, just maybe write an editorial or something, or just you say that, I don't like it that they're greedy, but gosh, yeah. Some people [unintelligible], I wouldn't go down that path."[3] *Id.* at 2:02. He also mentioned "there's so much craziness." *Id.*

Bell further stated, "There's actually, like um, you know, if you think, um, like law enforcement and you have contact with them, that's not a good thing, but on the other side, there's privileges that you can get from the federal government in order to kind of be trusted with them." *Id.* at 4:13. He acknowledge that he is "so lucky" for certain privileges and does not want to mess that up. *Id.* Bell also asked Witness 1 why he went into law enforcement. *Id.* at 6:03.

---

[3]     Luigi Mangione was charged by federal criminal complaint in the Southern District of New York with interstate stalking resulting in death, stalking through use of interstate facilities resulting in death, using a firearm to commit murder, and discharging a firearm equipped with a silencer in furtherance of a crime of violence for the December 4, 2024 killing of Brian Thompson, the CEO of UnitedHealthcare. *See, e.g.,* December 19, 2024 Press Release, https://www.justice.gov/usao-sdny/pr/luigi-mangione-charged-stalking-and-murder-unitedhealthcare-ceo-brian-thompson-and-use (accessed August 11, 2025). Per the Press Release, "Thompson was allegedly killed just because he held the position of chief executive officer of a health insurance company." *Id.* Mangione was also indicted by the State of New York in connection with the December 4, 2024 killing of Thompson, with charges including: Murder in the First Degree in furtherance of terrorism; two counts of Murder in the Second Degree; two counts of Criminal Possession of a Weapon in the Second Degree; four counts of Criminal Possession of a Weapon in the Third Degree; Criminal Possession of a Weapon in the Fourth Degree; and Criminal Possession of a Forged Instrument in the Second Degree. *See, e.g.,* December 17, 2024 Press Release, https://manhattanda.org/d-a-bragg-announces-murder-indictment-of-luigi-mangione/ (accessed August 11, 2025).

At the conclusion of the conversation, Witness 1 told Bell to stay out of trouble and "[d]on't act on any of those things." *Id.* at 3:40. Bell responded, "No. No. I think, uh, no, exactly. Don't act on it, don't even have the thoughts about it," to which Witness 1 responded, "Nope. Would be the best thing to do." *Id.* at 3:44.

## II. PROCEDURAL POSTURE

Section 871 states, in relevant part:

> Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing *any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States*, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, *or knowingly and willfully otherwise makes any such threat against the President*, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 871(a) (emphasis added). That is, Section 871 prohibits a person from knowingly and willfully making any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States. *See id.*

On April 7, 2025, a criminal complaint was filed with the Court alleging Bell violated 18 U.S.C. § 871(a). Dkt. 3. The Court issued an arrest warrant. Dkt. 5. Bell was arrested on April 7, 2025, and made his initial appearance before the Court on April 8, 2025. Dkt. 8.

On May 8, 2025, a Grand Jury sitting in the District of Maine returned a single-count indictment against Bell. Dkt. 37. Count One alleges:

> On about April 5, 2025, in the District of Maine, the defendant KEVIN BELL A/K/A RONEN STOLOFF knowingly and willfully made a threat to take the life of and to inflict bodily harm upon the President of the United

5

States. All in violation of Title 18, United States Code, Section 871(a).

*Id.*

Bell now moves to dismiss that indictment. Dkt. 46. Because his arguments are without merit, Bell's Motion should be denied.

## DISCUSSION

### I. The indictment is sufficient because it specifies the elements of the charged offense, apprises Bell of the charge against which he must defend, and allows him to contest it without fear of double jeopardy.

The First Circuit recently affirmed that, "[a]n indictment is generally constitutionally adequate if it 'specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy.'" *United States v. Coleman,* --- F.4th ----, 2025 WL 2027851, at \*6 (July 21, 2025) (*quoting United States v. Savarese,* 686 F.3d 1, 6 (1st Cir. 2012)); *see also Hamling v. United States,* 418 U.S. 87, 117 (1974) ("Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").

Further, "an indictment meets this standard if it 'use[s] the statutory language to describe the offense,' so long as it also includes enough 'facts and circumstances . . . to inform the accused of the specific offense with which he is charged.'" *Coleman,* 2025 WL 2027851, at \*6 (alterations in original) (*quoting Savarese,* 686 F.3d at 6); *see also Hamling*, 418 U.S. at 117-18. As the Supreme Court explained, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as

6

'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling,* 418 U.S. at 117 (*quoting United States v. Carll*, 105 U.S. 611, 612 (1882)). In determining whether an indictment is sufficient, "a court must reject arguments that embrace technical niceties at the expense of common sense." *United States v. Stepanets,* 879 F.3d 367, 372 (1st Cir. 2018) (citations omitted).

Here, the indictment specifies each element of the charged violation of 18 U.S.C. § 871. It states that, on about April 5, 2025, Bell made a threat to take the life of, or to inflict bodily harm upon, the President of the United States, and that he did so knowingly and willfully. Dkt. 37. The indictment sets forth the offense in the words of 18 U.S.C. § 871(a), which fully, directly, and expressly set forth the necessary offense elements without uncertainty or ambiguity. Additionally, it contains a "plain, concise, and definite written statement of the essential facts constituting the offense charged," as required by Rule 7(c)(1) of the Federal Rules of Criminal Procedure. Nothing more is required.

Contrary to Bell's suggestion that the indictment is deficient because it does not identify the threat made, Dkt. 46 at 3, the threat is clearly alleged. Bell threatened to take the life of, or to inflict bodily harm upon, the President of the United States. Dkt. 37. Bell cites no authority, binding or otherwise, that an indictment for violating 18 U.S.C. § 871(a) must contain a direct quotation of the threatening communication.

Bell also takes issue with the indictment's failure to allege: (1) how the alleged threat was made or communicated; (2) the immediacy of any intention to harm the President; (3) with specificity of when the alleged harm was to occur; (4) a true threat;

7

(5) Bell's subjective intent; (6) the person to whom the threat was made; and (7) which President the threat referenced. Dkt. 46 at 3. Bell again cites no authority, binding or otherwise, that an indictment charging a violation of 18 U.S.C. § 871(a) must contain such information. While some of these items—such as whether the threatening communication constituted a "true threat"—may be issues for a factfinder's determination at trial, the indictment need not contain multitudes. Other items Bell identifies, such as the indictment's purported failure to identify which President the threat referenced, ask the Court to willfully ignore basic and foundational principles. The United States has only one President at any time and 18 U.S.C. § 871(a), on its face, does not apply to former Presidents. *See generally* U.S. Const. art. 2, § 1, cl. 1.

Bell's argument conflates constitutional deficiency with his own preference that the indictment be elaborate and provide him with detailed and specific facts. The First Circuit recently rejected such a challenge to an indictment, albeit one charging kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). *Coleman,* 2025 WL 2027851, at *5. There, the defendant argued that the indictment—which alleged the statutory language but not a singular manner in which he was alleged to have committed the offense, how or when he involuntarily held the victim, and the purpose for which he kidnapped the victim—was insufficient to pass constitutional muster. *Id.* at *6-7. The First Circuit squarely rejected his argument because the indictment "faithfully track[ed] the language of the statute" and "notified [the defendant] not only of the elements of the crimes charged, but also of the relevant facts,"—that is, the date of the alleged offense, the victim's name, and the location. *Id.* at *8 (citations and internal quotations omitted). Nothing more was required. *Id.*

8

Similarly, the indictment here notifies Bell of the elements of the charged offense as well as the relevant facts, including the date the offense was committed in the District of Maine, the nature of the alleged threat, and the specific person against whom the threat was made. The indictment clearly informs Bell of the charge against which he must defend. Bell's arguments to the contrary ask the Court to set aside common sense. Moreover, if Bell is acquitted or convicted of the offense alleged in the indictment, there is no risk that he would be unable to plead that acquittal or conviction in bar of future federal prosecutions for making a threat to take the life of, or to inflict bodily harm upon, the President of the United States on about April 5, 2025.

Bell's reliance upon *United States v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) is misplaced, particularly when its holding is accurately situated in the context therein presented to the First Circuit. There, the defendant was convicted after a complex, eighty-six-day trial of a "dual-object conspiracy" in violation of 18 U.S.C. §§ 371, 1341 and four mail-fraud counts unrelated to the conspiracy. 994 F.2d at 888-89. The defendant challenged the sufficiency of "the engineering fraud prong of the conspiracy count" for failing to specify the false pretenses used in the offense. *Id.* at 892. Though the First Circuit ultimately concluded the deficiency in the indictment was harmless, it observed, "based on the unusual nature of mail fraud":

> Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute . . . We think a mail fraud conspiracy depends so crucially on the underlying fraud that the fraud also must be specified in the applicable count.

*Id.* at 893 (internal quotations and citations omitted).

9

Unlike the *Yefsky* defendant, who "could not be expected to defend himself from a charge of conspiring to join a conspiracy to perpetrate a fraud if the indictment did not identify the fraud that was the ultimate underlying offense," 994 F.2d at 893, Bell fails to articulate any way in which the indictment's faithful tracking of the statutory language and notification of the relevant facts prevents him from mounting his defense. Even assuming, without conceding, Bell could articulate the need for further specified details, his recourse was to timely seek a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. *See United States v. Debrow,* 346 U.S. 374, 378 (1953) ("The sufficiency of the indictment is not a question of whether it could have been more definite and certain. If the defendants wanted more definite information as to the name of the person who administered the oath to them, they could have obtained it by requesting a bill of particulars.").

Because the indictment specifies the elements of the charged offense, apprises Bell of the charge against which he must defend, and allows him to contest it without fear of double jeopardy, it is constitutionally sufficient. It also complies with the requirements of Rule 7 of the Federal Rules of Criminal Procedure. No more is required. Bell's Motion should be denied.

## II. The indictment is sufficient because it alleges Bell made the threat knowingly and willfully. Bell's subjective awareness need not be further alleged in the indictment.

"True threats of violence are outside the bounds of First Amendment protection and punishable as crimes." *Counterman v. Colorado,* 143 S. Ct. 2106, 2111 (2023). "The speaker need not actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Instead, true threats fall outside the protection of the First

Amendment because the prohibition on such threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id*. at 360 (internal quotations, modifications, and citations omitted). The First Amendment requires proof that the defendant at least "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman,* 143 S. Ct. at 2111-12.

Unlike the Colorado statute addressed in *Counterman*, which required an objective, reasonable-person standard rather than a subjective intent to threaten, *id*. at 2112, or 18 U.S.C. § 875(c) as addressed in *Elonis v. United States,* 575 U.S. 723 (2015), which is silent as to a requisite mental state, Section 871 contains the element that he "knowingly and willfully" made a proscribed threat against the President, *see* 18 U.S.C. § 871(a). Post-*Elonis*, that element requires proof of Bell's awareness of the threatening nature of his communication and would be satisfied if he made the statement either with the purpose of issuing a threat against the President or with knowledge the statement would be understood as a threat against the President. It may be appropriate to include Bell's subjective awareness as a separate element for clarity and explanatory purposes in instructions to a jury. However, Bell identifies no authority requiring that the various component parts of the constitutional definition of "true threats" or constitutional bounds of knowingly and willfully making such threats be alleged in detail in the indictment, much less that a defendant's subject awareness of the nature of a threatening communicating be spelled out therein. The indictment in this case is sufficient to inform Bell of the charge against him.

11

**III.    Bell's subjective awareness and whether Bell's communication constitutes a "true threat" are not properly raised in a motion to dismiss pursuant to Rule 12.**

Rule 12 of the Federal Rules of Criminal Procedure governs motions to dismiss, permitting a party to "raise by pretrial motion any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1), (b)(3)(B) (emphasis added). Typically, resolution of motions to dismiss an indictment "will turn on pure questions of law regarding the sufficiency of the indictment's allegations." *United States v. Dion*, 37 F.4th 31, 33-34 (1st Cir. 2022) (*citing United States v. Brissette,* 919 F.3d 670, 675 (1st Cir. 2019)). When resolving such motions requires addressing facts not alleged in the indictment, "a court may resolve a 'pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.'" *Id*. at 34 (*quoting United States v. Musso*, 914 F.3d 26, 29-30 (1st Cir. 2019)).

However, such pretrial review is not permitted "on an incomplete or disputed factual record." *United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019). Nor does Rule 12 "provide[] an occasion to force the government to defend the sufficiency of its evidence to be marshalled in support of proving the charged offense." *Id*. Facing a motion to dismiss an indictment, the question before the Court is "not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *Stepanets,* 879 F.3d at 372 (internal quotations and citations omitted). Thus, "a court must deny a motion to dismiss if the motion relies on disputed facts." *Id*. (citations omitted).

Here, the Court cannot resolve Bell's Motion, insofar as it argues Bell lacked a subjective awareness of the threatening nature of his communication, Dkt. 46 at 9-10, and that his statement was objectively not a true threat. Dkt. 46 at 4-10. Though couched as a challenge to the sufficiency of the indictment, Bell insists upon his own view of the circumstances of his statements to Witness 1. He makes various and sundry factual assertions, unsupported by evidence, that cannot be resolved pre-trial. For instance, Bell claims he lacked a subjective awareness of the nature of his threat because he was not aware others may regard the statement as threatening, is autistic and has trouble responding to social cues, was dissatisfied with the government, was making off-color attempts at humor or engaging in political hyperbole, and because there "was never any real possibility of violence" because he was far from both Washington, D.C. and President Trump and knew no one in, and had not made arrangements to visit, Washington, D.C. Dkt. 46 at 9-10. While many of those claims are simply irrelevant to the existence of a "true threat" or Bell's subjective awareness,[4] Bell must raise them—if at all—through the admission of evidence at trial consistent with the Federal Rules of

---

[4]    For example, Bell argues there is no indication "of when any future action might take place." Dkt. 46 at 8. As one district court recently observed, "[a] threat of violence can instill fear in a victim even when it is not tied to a definite time and place. Indeed, uncertainty as to when a threat may be carried out can compound the fear or disruption in the victim's life." *United States v. Ortiz,* CR-25-00153-PHX-DGC, 2025 WL 1532604, at *3 (D. Ariz. May 29, 2025).

Bell also argues "[t]here was never any real possibility of violence" for several reasons. Dkt. 46 at 10. However, the inquiry is whether Bell knowingly and willfully communicated a threat, not whether he intended or was able to carry out that threat. *See, e.g., United States v. Fulmer,* 108 F.3d 1486, 1494 (1st Cir. 1997) (citation omitted).

He also suggests his statement was not a "true threat" because, in his view, it was not unequivocal, unconditional, immediate, or specific. Dkt. 46 at 8. However, ambiguous language can constitute a threat, and the government must prove the statement is a threat, not that it is unambiguous. *United States v. Clemens,* 738 F.3d 1, 12 (1st Cir. 2013) (addressing a charged violation of 18 U.S.C. § 875(c)) (citation omitted).

13

Evidence.

Rule 12 does not provide a mechanism to force the government to complete the factual record in advance of trial or defend the sufficiency of its evidence to be marshalled at that trial. *Rodriguez-Rivera,* 918 F.3d at 35. Nor is the government required to "recite all of its evidence in the indictment." *Id.* (*quoting Stepanets,* 879 F.3d at 372). Because Bell seeks to require the government to do precisely that, his Motion should be denied.

## IV. Whether Bell's communication constitutes a "true threat" is a question for the factfinder at trial.

Bell's Motion should also be summarily denied because he asks the Court to determine whether his communication constitutes a "true threat," an issue entrusted to the factfinder at trial.

"Whether a statement constitutes a threat is an issue of fact for the trial jury, involving assessments of both credibility and of context." *United States v. Clemens,* 738 F.3d 1, 13 (1st Cir. 2013), *abrogated on other grounds by Elonis,* 575 U.S. 723 (internal quotations, citation, and modifications omitted); *see also, e.g., United States v. Fulmer,* 108 F.3d 1486, 1492 (1st Cir. 1997), *abrogated on other grounds by Elonis,* 575 U.S. 723 ("Whether a given statement constitutes a threat is an issue of fact for the trial jury . . . . While the statement on its face may be susceptible to more than one interpretation, some factors not discernable from the record, such as the tone of the defendant's voice or the credibility of the government's and [defendant's] witnesses, may legitimately lead a rational jury to find that this statement was a threat." (internal quotations and modifications omitted)); *United States v. Whiffen,* 121 F.3d 18, 22 (1st Cir. 1997),

*abrogated on other grounds by Elonis,* 575 U.S. 723 ("The proper interpretation of Whiffen's remarks . . . is a question of fact and, therefore, appropriately left for the jury. We cannot conclude that the interpretation preferred by Whiffen is, as a matter of law, the correct one."); *United States v. Hunt,* 82 F.4th 129, 136-37 (2d Cir. 2023) ("true threat" determination involves no legal principle warranting independent review of jury's conclusion, aligning with Second Circuit's well-established view that whether a communication is a "true threat" is a question of fact for the jury).

That is no less true merely because Bell claims his communication was "an off-color attempt at humor—political hyperbole," or that "as a matter of law" his alleged statements did not constitute a "true threat." Dkt. 46 at 8, 10. In *Clemens,* the First Circuit affirmed that the jury must choose among competing interpretations of allegedly threatening communications, even where the defendant argued his statements were generalized fantasy, sarcastic, cartoonish, and hyperbolic. 738 F.3d at 13 (*citing Whiffen,* 121 F.3d at 22 (where a defendant offered a non-threatening interpretation of statements, the choice among those interpretations was an issue of fact for the jury to decide)). Nor does the need to interpret statutes criminalizing speech "with the commands of the First Amendment clearly in mind," serve as "a basis on which to take away from a jury the factual question of whether or not [the defendant's communications] conveyed true threats." *Id.* (internal quotations and citations omitted).

While the First Circuit acknowledged the possibility that there may be cases in which no reasonable jury could conclude a statement was a threat, *Clemens,* 738 F.3d at 13, this is not such case. Nor do the cases Bell cites support any suggestion to the

contrary. In *Watts v. United States,* 394 U.S. 705 (1969), for instance, the defendant made a statement—conditioned upon his induction into the Armed Forces, which the defendant averred would not happen—in a small discussion group at a public rally on the grounds of the Washington Monument. 394 U.S. at 705-06. Both the defendant and the crowd laughed after the defendant's statement was made. *Id.* at 707. Whatever instruction *Watts* provides as to whether a particular statement in case-specific circumstances constitutes a "true threat," it offers no assistance to Bell.

The *Watts* court was concerned with punishing the defendant's constitutionally protected speech in the context of a political rally against a war. In stark contrast, Bell sought out a law enforcement officer sitting in a diner and initiated a conversation. Bell gave no indication he was employing political rhetoric, instead volunteering his history with law enforcement and of making statements that got him into trouble. He threatened to harm or kill the President and made apparent references to the attempted assassination of then-Former President Trump and the recent murder by Luigi Mangione.

A conviction for violating 18 U.S.C. § 871(a), based on a jury's finding that his statement was a "true threat," would in no way violate Bell's constitutionally protected right to speech. *See Fulmer,* 108 F.3d at 1492-93; *Whiffen,* 121 F.3d at 22. Bell's Motion should be denied because a properly instructed jury will determine whether his communication constitutes a "true threat" and consequently is not protected by the First Amendment.

**CONCLUSION**

For the foregoing reasons, Bell's Motion to Dismiss should be summarily denied in all respects.

Dated: August 11, 2025                    Respectfully submitted,

                                     Craig M. Wolff
                                     Acting United States Attorney

                    BY:    */s/ Nicholas Heimbach*
                           Assistant United States Attorney
                           United States Attorney's Office
                           100 Middle Street
                           East Tower, 6th Floor
                           Portland, Maine 04101
                           (207) 780-3257
                           Nicholas.heimbach@usdoj.gov

17

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, I electronically filed or caused to be electronically filed the Government's Response in Opposition to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Caleigh Milton, Esq.
Counsel for Defendant

                                       Craig M. Wolff
                                       Acting United States Attorney

BY:    */s/ Nicholas Heimbach*
                                         Assistant United States Attorney
                                       United States Attorney's Office
                                       100 Middle Street
                                       East Tower, 6th Floor
                                       Portland, Maine 04101
                                       (207) 780-3257
                                       Nicholas.heimbach@usdoj.gov